# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

| | |
|---|---|
| BYRON K. WELLS, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>        Plaintiff,<br><br>v.<br><br>KNORR-BREMSE AG, KNORR BRAKE COMPANY, NEW YORK AIR BRAKE LLC, WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION, and FAIVELEY TRANSPORT NORTH AMERICA, INC.,<br><br>        Defendants. | Case No: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Byron K. Wells, individually and on behalf of a class of all those similarly situated (the "Class"), brings this class action complaint against Defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake LLC (collectively, "Knorr"), Westinghouse Air Brake Technologies Corporation ("Wabtec"), and Faiveley Transport North America ("Faiveley") (collectively with Knorr and Wabtec, "Defendants") and alleges as follows:

## NATURE OF ACTION

1.　　This civil antitrust class action brought by current and former employees of Defendants—the world's largest rail-equipment suppliers—seeks to hold Defendants responsible for entering into unlawful agreements to restrain competition in the labor market for rail-equipment-service employees.

2.　　Defendants, through "no poach" agreements entered into without the

knowledge of their employees, collectively agreed not to solicit or recruit each other's employees, hire each other's employees without prior approval, or otherwise compete for employees.

3.    Rail equipment employees, like employees in any labor market, benefit when their employers compete for their services. Competition among employers leads to greater negotiating leverage for employees, which in turn leads to higher wages and greater mobility.

4.    Defendants Knorr and Wabtec, along with their respective subsidiaries, are each other's top competitors for passenger and freight rail equipment. Prior to Faiveley's acquisition by Wabtec in November 2016, Faiveley also competed with Knorr and Wabtec to attract, hire, and retain employees. Thus, Defendants competed with each other to attract, hire, and retain various employees, including rail-equipment industry project managers, engineers, sales executives, business unit heads, and corporate officers.

5.    To keep wages low, senior executives at Knorr and Wabtec (including executives at several of their U.S. subsidiaries) entered into no-poach agreements beginning no later than January 2009. At least by 2011, senior executives at Knorr and Faiveley (also including several executives at their U.S. subsidiaries) entered into no-poach agreements. Finally, no later than January 2014, senior executives at the U.S. subsidiaries of Wabtec and Faiveley similarly entered into no-poach agreements.

6.    These no-poach agreements lasted several years and were monitored and enforced by high-level executives at each company. As a result, Defendants' employees and class members were denied the benefits of competition, received compensation that was artificially suppressed, and were prevented from enjoying the mobility and choice-of-employer that would have existed in an otherwise unrestrained market.

7.      In July 2015, the Department of Justice ("DOJ") uncovered Defendants' no-poach agreements in the course of its review of the Wabtec-Faiveley merger. The DOJ released the results of this investigation to the public on April 3, 2018, when it simultaneously filed a complaint against Knorr and Wabtec for violations of Sections 1 and 3 of the Sherman Act, 15, U.S.C. §§ 1, 3, and a settlement of its claims with the same.

8.      The DOJ's investigation revealed that "for years [Defendants] maintained unlawful agreements not to compete with each other's employees." According to the DOJ's Competitive Impact Statement, those agreements "suppressed and eliminated competition to the detriment of employees by depriving workers of competitively important information that they could have leveraged to bargain for better job opportunities and terms of employment."

9.      The DOJ confirmed that it will not seek to compensate employees who were injured by Defendants' agreements. Without this class action, Plaintiff and the Class members will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their unlawful collusion. Plaintiff seeks overcharge damages stemming from the artificial suppression of their and other employees' wages caused by Defendants' no-poach agreements and their subsequent enforcement.

## JURISDICTION AND VENUE

10.      Plaintiff brings this action under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by plaintiff and the Class and to secure equitable and injunctive relief against defendants for violating §§ 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 3). Plaintiff and the Class also seek attorneys' fees, costs and other expenses under federal law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to § 16 of the Clayton Act (15 U.S.C. § 26), §§ 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 3) and 28 U.S. §§ 1331 and 1337.

12.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) is located in and transacts business throughout the United States, including in this District; (b) has substantial contacts throughout the United States, including in this District; and (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, and doing business in this District. Specifically, Defendant Knorr Brake Company has its headquarters in Westminster, Maryland.

13.     During the Class Period, Defendants and their subsidiaries employed Class members throughout the United States, including this judicial district.

14.     Defendants, directly or through their agents and subsidiaries, engage in interstate commerce in the production, distribution, and sale of rail equipment and services related thereto in the United States. The anticompetitive conduct engaged in by Defendants and their subsidiaries substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

15.     Venue is proper in this District under § 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants reside, may be found, and transact business within this district. Additionally, venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the acts giving rise to Plaintiff's claims occurred in this District and the interstate trade and commerce affected by the alleged conduct was and is carried out in substantial part within this District.

## PARTIES

**A.     Plaintiff**

16.     Plaintiff Byron K. Wells is a resident of Irving, Texas. Plaintiff was the Director of Program Management/Operations at Defendant New York Air Brake LLC, from 2012 to 2015. Because of the unlawful agreements entered into by Defendants, Plaintiff earned less compensation than he otherwise would have absent the alleged conspiracy.

**B.     Defendants**

17.     Defendant Knorr Brake Company is a Delaware corporation with its headquarters located in Westminster, Maryland. Knorr Brake Company manufactures train control, braking, and door equipment used on passenger rail vehicles. It is a wholly-owned subsidiary of Defendant Knorr-Bremse AG.

18.     Defendant New York Air Brake LLC is a Delaware company with headquarters located in Watertown, New York. It manufactures railway air brakes and other rail equipment used on freight trains. It is a wholly-owned subsidiary of Knorr-Bremse AG.

19.     Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") is a Delaware corporation headquartered in Wilmerding, Pennsylvania. Wabtec is a New York Stock Exchange-listed public company with global sales of $3.9 Billion in 2017. It is the world's largest provider of rail equipment and services. Wabtec leads the industry in the freight and passenger rail segments of the rail equipment industry. Wabtec Passenger Transit is a business unit of Wabtec based in Spartanburg, South Carolina that develops, manufactures, and sells rail equipment and services for passenger rail applications.

20.     Defendant Faiveley Transport North America ("Faiveley") is a New York corporation headquartered in Greenville, South Carolina. On November 30, 2016, Wabtec

acquired Faiveley, making Faiveley a wholly-owned subsidiary of Wabtec.

## FACTUAL ALLEGATIONS

### A.    The Rail-Equipment Industry Labor Market

21.    Defendants Knorr and Wabtec are the world's largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications. Before the Wabtec-Faiveley merger, Faiveley also competed with Knorr and Wabtec in the industry.

22.    In 2017, Wabtec employed approximately 18,000 full-time employees worldwide with operations in 31 countries. Additionally, Wabtec acquired approximately 5,700 employees in 24 countries through its acquisition of Faiveley in 2016. In 2017, Knorr employed approximately 27,700 employees worldwide.

23.    The U.S. railroad equipment manufacturing industry generates about $120 billion in revenue, which is highly concentrated—the 50 largest companies, including Defendants Knorr and Wabtec, account for more than 95% of industry revenue. Imported railroad equipment represents only about 5% of the U.S. railroad equipment market.

24.    Knorr and Wabtec (including Faiveley) are the world's largest rail-equipment suppliers and employers of rail-equipment employees, and are one another's leading rivals in the development, manufacture, and sale of equipment used in freight and passenger rail applications.

25.    Defendants and their subsidiary companies, absent these no-poach agreements, compete with one another and with firms at all levels of the rail-equipment industry supply chain to attract, hire, and retain employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

26.     Due to the highly concentrated market, the limited supply of employees who have rail equipment industry experience results in high demand for these qualified and experienced employees. Having extended vacancies in critical roles are common for firms in the industry as they try to recruit and hire an individual with the necessary skills, training, and experience for a job opening. One important source for such employees are the workforce of other rail-equipment industry participants, including the employees of Defendants.

27.     In addition to direct and unilateral applications from individuals interested in potential employment opportunities, a particularly effective technique to identify and recruit qualified employees is the direct solicitation of employees from an industry competitor. These firms use both internal employees and outside recruiters to communicate directly—whether by phone, e-mail, social and electronic networking, or in person—with an employee who has not otherwise applied for a job opening.

28.     The rail-equipment industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy. In addition, firms in the rail-equipment industry rely on direct solicitation of employees or other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

29.     Direct solicitation, often referred to as "cold calling," is a key competitive tool in a properly functioning labor market. This technique includes communicating directly in any manner (whether in person, in writing, on the phone, or through other electronic channels) with another firm's employee who has not otherwise applied for or inquired about a job opening.

30.     The most sought-after employees are often those who are not actively seeking to change employers, compared with unemployed persons and employees who are actively seeking

new employment. This necessarily means that these desirable employees are going to be difficult to reach without active solicitation.

31.     Through soliciting (also called poaching) a competitor's employees, a company is able to reap the benefits of the initial efforts its rival has expended in finding, hiring, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, in a naturally competitive market, if each Defendant was truly acting in its own independent self-interest, it would solicit the others' employees, including by offering increases in benefits and pay.

32.     Compensation—even for those employees not being targeted by poaching—is significantly impacted by cold calling in several ways. First, without receiving cold calls from rival companies, current employees of a firm lack the necessary information regarding potential pay packages available elsewhere and therefore lack leverage over their employers when negotiating pay increases. When a current employee receives a cold call from a rival company with an offer that exceeds her or his current compensation, that employee has the option of accepting the larger amount or using that offer to negotiate her or his salary with their current employer. Regardless of the route chosen by the employee targeted by cold calling, it opens up an opportunity to use competition among potential employers to increase her or his compensation and mobility.

33.     Second, cold calling also increases information on compensation packages in the larger employee market. Once one employee knows about a higher salary or compensation package available elsewhere, they may inform their coworkers. As a result, other employees are able to use the information and increased transparency to negotiate pay increases themselves or seek out employment at another firm with that knowledge.

34.     Third, increased information and transparency regarding compensation levels in the market generally tends to increase compensation packages offered for new recruits and hires because there is pressure to match or exceed the highest compensation package offered to new hires by rival employers in order to remain competitive.

35.     Fourth, when firms expect that their experienced, skilled employees may be cold called and poached by rivals, it may preemptively increase its own current employees' compensation to reduce the risk that its rivals will be successful poachers of its undercompensated employees.

36.     Because it is in their best interest to do so, rail-equipment-industry employers will compete with one another to attract employees in a competitive market. Similarly, this competition benefits employees because it makes them more knowledgeable about job opportunities available to them and improves the employee's position for negotiating a better salary and other terms of employment.

37.     Defendants' unlawful no-poach agreements restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in this labor market.

38.     Defendants' scheme to restrain competition also included notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations. In these circumstances, when an employee at one Defendant contacted a second Defendant, the second Defendant would typically (a) notify the first Defendant and (b) not consider the applicant without permission of the other Defendant. Again, if Defendants were acting in their independent self-interest, they would not preemptively tell their competitors that they were offering jobs to the competitor's employees

or refuse to bid against their competitors.

**B.    Defendants' Unlawful No-Poach Agreements**

39.    Over a period spanning multiple years, Defendants conspired to suppress the compensation paid to their workers and other Class members by entering into no-poach agreements with each other to eliminate competition for employees between them (including between their subsidiaries and across multiple business units).

40.    Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no- poach agreements that involved promises and commitments not to solicit or hire each other's employees. These no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate officer positions, and restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

41.    Upon information and belief, Defendants also engaged in collusive discussions in which they exchanged competitively sensitive compensation information in order to limit the compensation offered to current and prospective workers.

42.    In furtherance of their conspiracy, Defendants agreed to severely limit their competition for Class members' services by abandoning one of the most effective ways of recruiting employees: solicitation of competitors' employees. Defendants agreed amongst themselves not to contact their co-conspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative.

43.    In these circumstances, when an employee at one Defendant contacted a second Defendant, the second Defendant would typically (a) notify the first Defendant and (b) forebear

considering the applicant without permission of the other Defendant.

44.     These information exchanges and agreements were executed and enforced by senior company executives and implemented throughout their U.S. subsidiaries. The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction, or legitimate collaboration between the companies.

### The Wabtec-Knorr Agreement

45.     Beginning no later than 2009, Wabtec's and Knorr Brake Company's most senior executives entered into an express no-poach agreement and then actively managed that agreement through direct communications. For example, in a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent case for both companies. As you so accurately put it, 'we compete in the market.'" This agreement was well-known to senior executives at the parent companies, including top Knorr executives in Germany, who were included in key communications about the no-poach agreement. In furtherance of their agreement, Wabtec and Knorr Brake Company informed their outside recruiters not to solicit employees from the other company.

46.     In some instances, Wabtec and Knorr Brake Company's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr Brake Company without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at Knorr Brake Company stated that she would not even consider a Wabtec candidate who applied to Knorr Brake Company without the permission of his counterpart at Wabtec.

47.     Wabtec and Knorr's no-poach agreements also reached the companies' U.S.

rail-equipment businesses. In July 2012, for example, a senior executive at New York Air Brake LLC informed a human resources manager that she could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

48.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited a Knorr Brake Company employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that she had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

**The Knorr-Faiveley Agreement**

49.     Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company. In October 2011, a senior executive at Knorr Brake Company explained in an e-mail to a high-level executive at Knorr-Bremse AG that she had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at Knorr Brake Company and Faiveley's U.S. subsidiary actively managed the agreement through direct communications with each other.

50.     In or about 2012, a senior executive at Knorr Brake Company discussed the

companies' no-poach agreement with an executive at Faiveley Transport North America at a

trade show in Berlin, Germany. Subsequently, the executives enforced the no-poach agreement

through direct communications with each other. This no-poach agreement was known to other

senior executives at the companies, who directly communicated with each other to ensure

adherence to the agreement. For example, in October 2012, executives at Faiveley Transport

North America stated in an internal communication that they were required to contact Knorr

Brake Company before hiring a U.S. train brake engineer.

51.    After Wabtec announced its proposed acquisition of Faiveley in July 2015,

a high-level Knorr executive directed the company's recruiters in the United States and

elsewhere to raid Faiveley for high-potential employees, temporarily "cheating" on the no-

poach agreement.

**The Wabtec-Faiveley Agreement**

52.    Beginning no later than January 2014, senior executives at Wabtec Passenger

Transit and Faiveley Transport North America entered into a no-poach agreement in which

the companies agreed not to hire each other's employees without prior notification to and

approval from the other company.

53.    Wabtec Passenger Transit and Faiveley Transport North America executives

actively managed and enforced their agreement with each other through direct communications.

For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring

discussions with a U.S.-based project manager at Faiveley Transport North America without first

getting permission from Faiveley Transport North America executives. In an internal e-mail to

his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good

guy, but I don't want to violate my own agreement with [Faiveley Transport North America]."

13

Only after receiving permission from Faiveley Transport North America did Wabtec Passenger
Transit hire the project manager. One month later, Wabtec Passenger Transit senior executive
informed his staff that hiring Faiveley Transport North America's employees was "off the table"
due to the agreement with Faiveley Transport North America not to engage in hiring discussions
with each other's employees without the other's prior approval.

54.     In July 2015, Wabtec and Faiveley publicly announced their intent to merge.
Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a
wholly-owned subsidiary of Wabtec.

**C.     The DOJ Investigation**

55.     For many years the DOJ has been investigating the use of no-poach agreements in
a variety of industries. The DOJ has brought civil actions against some of the largest companies
in the United States- including Adobe, Apple, eBay, Google, Intel, Intuit, and Lucasfilm-for
entering into no-poach agreements.

56.     In October 2016, the DOJ and FTC released guidance in the form of the Antitrust
Guidance for Human Resource Professionals, and the DOJ made public announcement of its
intent to criminally investigate naked no-poaching or wage-fixing agreements unrelated or
unnecessary to a larger legitimate collaboration between employers. The DOJ indicated that if a
non-poaching agreement is separate from or not reasonably necessary to a larger legitimate
collaboration between the employers, the agreement is deemed illegal without any inquiry into
its competitive effects.

57.      In January 2018, the DOJ announced that it would begin its first criminal cases
involving alleged no-poaching agreements in violation of the Sherman Act. Assistant Attorney
General ("AAG") Makan Delrahim warned that if such activity had not been halted by the time

of the October 2016 DOJ policy announcement, the DOJ would "treat that [conduct] as criminal."

58.    After Wabtec indicated its intent to acquire and merge with Faiveley in July 2015, the DOJ began a review of the proposed merger. In connection with that review, the DOJ obtained and reviewed documents and materials provided by the companies. The DOJ's investigation of the Wabtec-Faiveley merger uncovered the companies' no-poach agreements, which then resulted in the launch of a separate investigation, pursuant to which the DOJ found the companies had entered into the no-poach agreement alleged herein.

59.    The DOJ found the no-poach agreements unlawfully allocated employees between the companies and were *per se* illegal under the Sherman Act because Defendants' agreements "disrupted the normal bargaining and price-setting mechanisms that apply in the labor market" and that Defendants' agreements "were naked restraints on competition for employees and were not reasonably necessary to any separate legitimate business transaction or collaboration between the firms."

60.    At the conclusion of its investigation, the DOJ filed a complaint on April 3, 2018, in federal court against Knorr and Wabtec and simultaneously filed a settlement agreement with the two companies. The DOJ's complaint alleged that Knorr and Wabtec, "[o]ver a period spanning several years . . . entered into similar no-poach agreements with one another to eliminate competition between them for employees." The head of the Antitrust Division of the DOJ, Assistant Attorney General Makan Delrahim, stated that "[t]he unlawful agreements . . . restrained competition for employees and deprived rail industry workers of important opportunities, information, and the ability to obtain better terms of employment." He explained that the complaint was "part of a broader investigation by the Antitrust Division into

naked agreements not to compete for employees—generally referred to as no-poach agreements."

61.     The terms of the settlement prohibit Wabtec and Knorr, as well as their subsidiaries (including Faiveley) from entering, maintaining, or enforcing no-poach agreements with any other companies going forward.

62.     The DOJ emphasized that the settlement agreement with Defendants covered a restraint on soliciting, recruiting, hiring without approval, or otherwise competing for various employees, including "project managers, engineers, executives, business unit heads, and corporate officers." The DOJ's Competitive Impact Statement stated that the agreements "suppressed and eliminated competition to the detriment of employees by depriving workers of competitively important information that they could have leveraged to bargain for better job opportunities and terms of employment."

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action on behalf of himself and under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) as a representative of the following Class:

> All persons employed by Defendants or their wholly-owned subsidiaries between January 1, 2009 and the present.
>
> Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants and employees hired outside of the United States to work outside of the United States. The "United States" includes all fifty states, the District of Columbia, and all U.S. territories. Also excluded from the class are Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors and the Judge to whom this case is assigned and the Judge's staff.

64.     Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in

any other way.

65.    **Numerosity.** The Class is so numerous that individual joinder of all its members is impracticable. While the precise number and identification of class members is unknown to Plaintiff at this time, the Class is believed to number in the hundreds, if not thousands.

66.    **Typicality**. Plaintiff's claims are typical of the claims of the Class members. Plaintiff and all Class members were damaged by the same wrongful conduct by Defendants, *i.e.*, Defendants' agreement denied them the benefits of competition in their employment and received lower wages as a result.

67.    **Adequacy.** Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of the Class members he seeks to represent.  Plaintiff has retained counsel competent and experienced in the prosecution of complex antitrust class actions, and together Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of the Class.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

68.    **Commonality.** Common questions of fact and law exist as to all class members. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include the following:

- Whether Defendants entered into non-poaching agreements with each other, agreeing not to solicit each other's employees;

- Whether Defendants' conduct violates Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

- Whether such agreements are *per se* violations of the Sherman Act;

- Whether Defendants conspired to, and in fact did suppress competition in the market for rail equipment employees;

- Whether Defendants deliberately and fraudulently concealed their conduct;

- Whether Plaintiff and Class members suffered injury resulting from Defendants' conduct, and if so, the nature and scope of those injuries;

- Whether any such injury constitutes antitrust injury; and

- The measure of damages suffered by Plaintiff and Class members.

69. **Predominance.** These common questions predominate over any questions affecting only individual Class members.

70. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts, in which individual litigation of thousands of cases (or more) would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments, the prospect of a race for the courthouse, and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues common to all Class members' claims. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

71. Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted, and can continue to act, in violation of the antitrust laws in ways that have affected every member of the Class.

18

## INTERSTATE COMMERCE

72.     During the relevant Class Period, Defendants employed Plaintiff and Class members in several states, including at least California, Delaware, Maryland, New York, Pennsylvania, South Carolina, and Texas. Defendants' subsidiaries also employed workers in several states, including at least California, Illinois, Kentucky, Ohio, Virginia, and Wisconsin.

73.     There is national competition in the rail and freight labor industry, as many of these firms are spread out around the country. Additionally, the nature of passenger and freight rail lines is that is facilitates inter-and intrastate transport of workers and business. Finally, states compete to have rail-equipment manufacturers and suppliers establish offices within their boundaries. All of this results in employment in the industry crossing state lines.

74.     Similarly, there is national labor competition in the rail and freight industry. The wages of each Defendant are considered relevant to competition regardless of the location of individual offices, and many Class members moved, or considered moving, across state lines to pursue employment opportunities.

75.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## EFFECTS ON COMPETITION AND ANTITRUST INJURY

76.     Defendants restricted competition in the labor market by agreeing to not solicit each other's employees and to limit compensation for their employees. Defendants' conduct had the purpose and effect of artificially suppressing and lowering the compensation paid to Plaintiff and Class members.

77.     In a competitive labor market, employers compete with one another to attract employees. Competition in the labor market benefits employees because it increases the

available job opportunities that employees learn about. IT also improves an employee's ability to negotiate for a better salary and other terms of employment. As the DOJ explained in its 2016 announcement, "[c]ompetition is essential to well-functioning markets, and job markets are no exception." The DOJ's 2016 Antitrust Guidance for Human Resource Professionals further explains that "competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment."[1]

78.    Solicitation in the employment marketplace creates competition, which in turn results in increased compensation for employees. Strategies like cold calling may result in offers that exceed an employee's current salary, which allows employees to either accept that offer or use it to negotiate their salary with their current employer.

79.    With no-poach agreements in place, an employer has no incentive to offer competitive compensation. When the threat of a rival employer offering a higher salary disappears, employers have no reason to raise their own employees' compensation.

80.    The ability of rival employer to attempt to poach employees results in greater transparency for compensation, and therefore raises the baseline compensation received by employees in general. When one employee learns about higher salaries being offered by a rival employer, it is far more likely for that knowledge to spread to other employees and increase the baseline salary expectations for a much larger group of employees. Therefore, it is not only the specifically-targeted employees of Defendants who were harmed by Defendants' anti-poaching agreements, but rather all Class members employed by Defendants.

## FRAUDULENT CONCEALMENT AND TOLLING

81.    Defendants affirmatively, actively, and fraudulently concealed their unlawful

---

[1]    U.S. Department of Justice, Antitrust Guidance for Human Resource Professionals (October 2016), https://www.justice.gov/atr/file/903511/download

conduct from Plaintiff and the Class. Plaintiff did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy until the DOJ's settlement with Defendants became public on April 3, 2018. Plaintiff and Class members were unaware of Defendants' unlawful anti-poaching agreements and conspiracy during the limitations period.

82.    Plaintiff had no reason to know, or even suspect, that Defendants had conspired to suppress compensation to their employees before the DOJ's public statements on April 3, 2018.

83.    The content of Defendants' communications was private and were not available to Plaintiff and Class members. Defendants' discussions in furtherance of their conspiracy often occurred through direct, private conversations between senior executives or through email exchanges between senior executives or recruiters. Defendants chose these avenues of communication to avoid revealing their conspiracy to Plaintiff and Class members.

84.    Despite the DOJ's history of investigating similar non-poaching agreements, the DOJ only became aware of the specific non-poaching agreement between Defendants in the course of its 2016 investigation into Wabtec's acquisition of Faiveley. However, even then, Plaintiff and Class members were not privy to the details of the investigation and did not have access to the relevant documents that were surrendered to the DOJ at that time. Before the DOJ's announcement, none of the relevant communications between Defendants were public or could have been known to Plaintiff.

85.    Additionally, Defendants publicly described themselves as competitors. Wabtec's 2017 Form I 0-K listed Knorr as a "principal competitor." Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive." And in the related commercial vehicle market, Knorr identified WABCO (a trade name of Wabtec) as "its principal competitor." These

statements indicated to the public that Defendants were competing, not acting as co-conspirators and agreeing not to compete in the market for rail equipment employees.

86.     Wabtec's 2017 10-K also stated that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates." Knorr's Code of Conduct similarly states that the company expected "the entire workforce not only to observe internal regulations but also observe the law[.]" These statements indicated that Defendants were acting lawfully, not engaging in a long-running anticompetitive conspiracy to suppress the compensation of their employees.

87.     Therefore, the applicable statute of limitations has been tolled with respect to Plaintiff's claims regarding Defendants' unlawful conspiracy.

## CLAIM FOR RELIEF

### Violation of Sections 1 and 3 of the Sherman Act
### 15 U.S.C. §§ 1,3

88.     Plaintiff incorporates the allegations in each above numbered paragraph.

89.     Beginning as early as 2009, Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Specifically, Defendants agreed to restrict competition for Class members' employment opportunities through refraining from solicitating each other's employees, thereby artificially fixing the compensation of Class members, all with the purpose and effect of suppressing Class members' compensation and restraining competition in the rail-equipment employment market for Class members.

90.     Defendants' conspiracy injured Plaintiff and other Class members by keeping

their compensation artificially low and by depriving them of free and fair competition in the rail-equipment labor market.

91.     Defendants' anticompetitive conduct is a horizontal agreement among would-be competitors and amounts to a per se violation of Sections 1 and 3 of the Sherman Act.

92.     As a direct and proximate cause of Defendants' unlawful conduct and acts taken in furtherance of their conspiracy, Plaintiff and Class members have and will continue to receive compensation that is less than they would have received had the market for their services been competitive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, pray for judgment against Defendants as follows:

1.    An order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), appointing Plaintiff and his counsel to represent the Class, and direct that reasonable notice of this action pursuant to Federal Rule of Civil Procedure 23(c)(2) be given to the Class;

2.    An order finding that Defendants are jointly and severally liable for the damages incurred by Plaintiff and the Class members;

3.    An order declaring that the actions of Defendants, as set out above, are (a) an unreasonable restraint of trade or commerce in violation of Sections I and 3 of the Sherman Act and (b) a *per se* violation of Sections I and 3 of the Sherman Act;

4.    A permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful

communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

5.  An award of monetary damages in favor of the Plaintiff and the Class and against Defendants for their violation of the Sherman Act, in an amount trebled with interest according to the federal antitrust laws;

6.  An award of costs, expenses, and attorneys' fees as permitted by law;

7.  Pre- and post-judgment interest, to the extent allowable; and

8.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Federal Rule of Procedure 38(b), on all issues so triable.

Dated: July 24, 2018                                  Respectfully submitted,

**MIGLIACCIO & RATHOD LLP**

*/s/ Nicholas A. Migliaccio*
Nicholas A. Migliaccio, Esq.
(Maryland Federal Bar No. 29077)
Jason S. Rathod
(Maryland Federal Bar No. 18424)
412 H Street NE, Suite 302
Washington, DC 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
E-mail: nmigliaccio@classlawdc.com
            jrathod@classlawdc.com

Daniel E. Gustafson *
Daniel C. Hedlund *
Catherine K. Smith *
Brittany N. Resch *
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402

24

Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        csmith@gustafsongluek.com
        bresch@gustafsongluek.com

Richard M. Paul, III *
Ashlea G. Schwarz *
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, MO 64106
Telephone: (816) 984-8103
Facsimile: (816) 984-8101
E-mail: Rick@PaulLLP.com
         Ashlea@PaulLLP.com

Kevin Landau *
Tess Bonoli *
**TAUS, CEBULASH &
LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
Facsimile: (212) 931-0703
E-mail: klandau@tcllaw.com
        tbonoli@tcllaw.com

Brian Douglas Penny *
**GOLDMAN SCARLATO & PENNY,
P.C.**
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Telephone: (484) 342-0700
Facsimile: (484) 580-8747
E-mail: penny@lawgsp.com

Simon B. Paris *
Patrick Howard *
**SALTZ, MONGELUZZI, BARRETT &
BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999

25

E-mail: sparis@smbb.com
phoward@smbb.com

Dianne M Nast *
**NAST LAW LLC**
1101 Market Street
Suite 2801
Philadelphia, PA 19108
Telephone: (215)923-9300
Facsimile: (215) 923-9302
E-mail: dnast@nastlaw.com

*Attorneys for Plaintiffs*

\* *pro hac vice* admission to be sought